FREDERICK P. BURGETT *et al.*

*v.*

BENJAMIN C. TALIAFERRO *et al.*

*Filed at Ottawa November 13, 1886.*

1. LIMITATION—*under the act of 1839—color of title—what constitutes.* A warranty deed purporting to convey a lot in fee simple, is good color of title.

2. SAME—*in case of tenancy in common—extent of the color of title—whether there is a disseizin as to co-tenants.* If one of several tenants in common makes a conveyance purporting to convey only his interest in the premises, the grantee will become a tenant in common with the others, and his deed will not be color of title to any greater interest than his grantor had;

but where the tenant in common makes a warranty deed for the entire estate, this will operate as a disseizin of his co-tenants, and the Statute of Limitations will commence running against them from the moment such deed is placed upon record.

3. SAME—*whether color of title has been obtained in good faith.* The execution of a deed purporting to convey the fee, and the subsequent possession of the property, and the payment of all taxes thereon, by the grantee, create the presumption that the grantee acquired the deed in good faith, and that his possession is under his deed; and it devolves on those claiming adversely, to prove, either that the deed was not obtained by the grantee in good faith, or that his possession was not under the deed.

4. SAME—*effect of notice of outstanding title, upon claim and color of title.* Color of title, under the Limitation law of 1839, does not mean actual title, nor does the question of notice of outstanding titles affect it. Even a knowledge of an adverse claim upon the property does not, of itself, indicate bad faith in the purchaser, and is not evidence of it unless accompanied by some improper means to defeat such claim.

5. LANDLORD AND TENANT—*the latter acquiring tax title adversely to the former.* Where a tenant goes into possession of premises under an agreement with the owner to pay the taxes thereon, etc., the tenant can not acquire a title to the property adversely to his landlord, or his heirs, growing out of his neglect to pay the taxes. At most, the tenant could only become seized, under the tax deed, in trust for his landlord, if living, and, if dead, then for his heirs.

6. PURCHASER *of tax title, with notice of his grantor's relation to the title, as affecting the rights of another.* Where a tax title is acquired by one in violation of the holder's duty to pay the taxes, under a contract that he will pay them, a purchaser from him with notice that the title was wrongfully obtained, will acquire no better right or title than his grantor had, and will hold the title in trust for the rightful owner, the same as his grantor held it.

7. TENANTS IN COMMON—*tax title acquired by one—rights and obligations of the co-tenants.* Where one tenant in common in possession jointly with his co-tenants, as one family, acquires a tax title to the premises, it will be held by him for the equal benefit of his co-tenants, they being only required to make contribution for the amount paid for such adverse title.

8. SAME—*admission by one tenant in common—effect on others.* An admission or declaration of one who holds an interest in real estate, that he has an estate for life, only, can not affect the rights of others claiming an interest in the same property; and when such admission is based upon a mistake of the extent of the party's rights, and no one has acted upon the same so as to change his condition in consequence thereof, the party making it will not be concluded thereby.

9.  PAROL EVIDENCE—*to explain or contradict recitals in contract as to character of possession.*  A recital in a contract for the sale of an interest in a lot, that the vendor does thereby put the purchaser in possession, may be explained or contradicted by parol evidence.  It may be shown that the purchaser was not put in possession under such contract, but under a subsequent agreement.

APPEAL from the Circuit Court of Mercer county; the Hon. JOHN J. GLENN, Judge, presiding.

Frederick P. Burgett filed his petition in the circuit court of Mercer county, on the 13th of October, A. D. 1885, praying partition of lot 10, in block 10; in Keithsburg.  He made Benjamin C. Taliaferro, Maria Harolson, Amanda Armindale, Alvin Patterson, the unknown heirs-at-law of David Patterson, deceased, and David Wolfe, defendants, and claimed that the lot was owned thus:  Frederick P. Burgett, $\frac{22}{110}$ parts; Benjamin C. Taliaferro, $\frac{55}{110}$ parts; Maria Harolson and the unknown heirs-at-law of David Patterson, deceased, each $\frac{11}{110}$ parts; and Amanda Armindale and Alvin Patterson, each $\frac{11}{220}$ parts.  The petition was subsequently amended, alleging a conveyance by Benjamin C. Taliaferro, of his interest, to Robert B. Taliaferro.

Benjamin C. Taliaferro answered, alleging that he bought the entire lot, in good faith, from Jane Patterson, and took a warranty deed from her therefor, on the 25th day of August, A. D. 1874, which he caused to be recorded in the proper office on the 12th day of October, A. D. 1874; that he immediately entered into actual possession of the lot, and retained the same until after the petition was filed, and during all that time paid all the taxes assessed against the lot, and he therefore set up and relied upon the first section of the "Act to quiet possessions and confirm titles to land," approved March 2, 1839.  (Purple's Real Estate Statutes, 426.)  The answer of Robert B. Taliaferro claimed that he purchased in good faith, and was the owner of the lot.  Amanda Armindale and Alvin Patterson answered jointly and severally, alleging that

the lot was sold on the 10th of June, A. D. 1850, for the taxes of 1849, to Benjamin D. Ellett, and that a deed was made to him by the sheriff of Mercer county, on the 22d day of February, A. D. 1853; that on the 16th day of March, A. D. 1854, Ellett sold the lot to James Patterson for $100, and conveyed the same to him; that Patterson bought in good faith, believing that he was acquiring title to the same, and went into possession immediately afterwards, under said deed, claiming title in fee simple, in his own right, to the lot, and that he continued to occupy the same from that time until his death, in 1861, and paid all taxes thereon for each year, from A. D. 1853 to A. D. 1860, inclusive; that he devised the lot to his mother, Jane Patterson, during her lifetime, and the remainder, after her death, to the defendants Amanda and Alvin. The defendant Alvin Patterson also filed a cross-bill, alleging the same facts as alleged in the joint and several answers of himself and Amanda Armindale, and praying certain specific relief. Answer was filed by Benjamin C. and Robert B. Taliaferro, putting in issue the allegations of the cross-bill, and replications were filed to the answers to the original and cross-bills.

At the April term, A. D. 1886, of the Mercer circuit court, the cause was heard on bill, answers, cross-bill and answer, and evidence then submitted, and the court thereupon decreed that both the original and cross-bills be dismissed.

The facts in evidence, about which there is no dispute, are: Matthew Patterson became the lawful owner of the lot in controversy, in A. D. 1848. In 1849 he built a brick house upon it, but in the fall of that year, and before the house was finished, Matthew rented the house and lot to B. D. Ellett, for two years, or until Matthew should return from California, to which place he was intending to soon depart. Ellett, in consideration of the use of the property, paid Matthew, in advance, $100, and agreed to finish the building, take care of the property, pay the taxes, and settle the balance on

Matthew's return. Ellett then went into the possession of the property. On the 25th day of February, 1850, Matthew conveyed the lot to Stephen S. Phelps, by a deed absolute on its face, but in reality to secure the payment of a sum of borrowed money. Soon after this, in the spring of 1850, Matthew and his father, and his brother, John, went to California. Not long afterwards his father died,—then, either in 1850 or in 1851, Matthew died, intestate,—never having returned from California. Matthew had never been married, and hence left neither widow nor lineal descendants surviving him. He left, as his heirs-at-law, his mother, Jane Patterson, his brothers, David, John, James, William, Robert and Charles, and his sisters, Eliza, (now Harolson,) Maria, (now Walker,) and Jane, (now Lloyd.) David had gone to Canada before Matthew went to California, and has never been heard of since, and so has long since, in legal estimation, been presumed to be dead. John died soon after Matthew died, leaving neither widow nor lineal descendants, but his mother and his remaining brothers and sisters, above named, his heirs-at-law. On the 10th of June, 1850, the lot was sold to B. D. Ellett for the taxes of 1849. No redemption being effected, the sheriff conveyed the lot to Ellett on the 22d day of February, A. D. 1853, and this deed was recorded February 28, 1853. On the 28th day of May, 1852, Stephen S. Phelps conveyed the lot, by warranty deed, to the "heirs-at-law of Matthew Patterson, deceased," and the deed was duly recorded August 4, 1852. B. D. Ellett conveyed, by quitclaim deed, to James Patterson, on the 16th day of March, A. D. 1854, which deed was recorded on the 24th of May, 1861. James died testate, in June, 1861, leaving a widow, Amanda, (since intermarried with a man named Armindale,) and a son named Alvin, surviving him. By his last will and testament he devised and bequeathed the rents and profits of the house on this lot to his mother, Jane Patterson, during her life, and he devised the lot, subject to this charge, to his wife, Amanda, and his

son, Alvin, which will was duly probated in the proper office on the 18th of June, 1861. William Patterson conveyed and quitclaimed the lot to his mother, Jane Patterson, by deed dated August 1, 1872, which was duly recorded July 17, 1874. Charles Patterson conveyed and quitclaimed the lot to his mother, Jane Patterson, September 12, A. D. 1872, which was also recorded July 17, 1874. Jane Lloyd conveyed and quitclaimed the lot to her mother, Jane Patterson, on the 1st of August, A. D. 1872, and this also was recorded on the 17th of July, 1874. On the date therein stated, the following agreement was made:

"State of Illinois, Mercer County,
Keithsburg, *June 16, 1874.*

"This is to certify that I have this day sold to B. C. Taliaferro all my interest that I now hold in lot ten (10), in block ten (10), in the town of Keithsburg, in said county, said interest consisting of what I claim as the heir of Matthew R. Patterson, and the interest of four of my children, as heirs of Matthew R. Patterson; and I do further agree and bind myself to get a deed from my daughter, Eliza Walker, by the 1st day of August next, for her interest in said lot; and I do hereby put the said B. C. Taliaferro in possession of said lot, and to make him, if necessary, any other deed for the conveyance of my interest in said property or what other interest I may hereafter acquire, and for which property, so sold as aforesaid, the said B. C. Taliaferro binds himself to pay to the said Jane Patterson, in money, on the 1st day of August, A. D. 1874, if necessary, and if not, on the 1st day of September next, the sum of $100, for which he has given his promissory note, payable on the 1st day of August, A. D. 1874.

"Given under my hand and seal this 16th day of June, A. D. 1874.     Jane Patterson. [seal.] "

This was acknowledged before T. S. Cummins, J. P., the same day, and recorded July 17, 1874.

On the 25th day of August, A. D. 1874, Jane Patterson assumed to convey the lot to Benjamin C. Taliaferro, by warranty deed, and it was duly recorded on the 12th day of October, 1874, and on the 12th day of October, 1885, Benjamin C. Taliaferro conveyed the lot to Robert B. Taliaferro, by quitclaim deed. On the 17th of November, A. D. 1883, Robert Patterson assumed to convey the lot, by quitclaim deed, to Frederick P. Burgett, and on the 3d day of December, A. D. 1883, Eliza Walker also assumed to convey the lot, by quitclaim deed, to Frederick P. Burgett. It was agreed that James Patterson paid all taxes assessed on the property from 1853 to 1860, inclusive; that Jane Patterson paid all taxes assessed thereon from 1861 to 1872, inclusive, and that Benjamin C. Taliaferro paid all taxes levied and assessed on the property for the years A. D. 1874 to A. D. 1884, inclusive.

Messrs. BASSETT & WHARTON, for the appellants:

When a tenant in common enters, claiming under the common title, or without any other claims of title, then he can not claim adversely. *Busch* v. *Huston,* 75 Ill. 347; *Ball* v. *Palmer,* 81 id. 370; *McClellan* v. *Kellogg,* 17 id. 504.

The doctrine of adverse possession is to be taken strictly, and must be hostile in its inception. *McClellan* v. *Kellogg,* 17 Ill. 504; *Ambrose* v. *Raley,* 58 id. 509; *Medley* v. *Elliott,* 62 id. 535; *Busch* v. *Huston,* 75 id. 347; *Rigg* v. *Cook,* 4 Gilm. 357.

Taliaferro having entered into possession as co-tenant, any purchase of title made after that, inures to the benefit of all the co-tenants. *Brocken* v. *Cooper,* 80 Ill. 225; *Titsworth* v. *Stout,* 49 id. 78; Freeman on Co-tenancy, secs. 158, 166.

Taking the original contract into consideration, which was recorded, and all the circumstances, it looks as though Taliaferro proceeded as he did, to allay suspicion, and to obtain the title by limitation, through that means. This was bad faith. *Bowman* v. *Wittig,* 39 Ill. 416; *Dalton* v. *Lucas,* 63

id. 337; *O'Halloran* v. *Fitzgerald,* 71 id. 53; *Hardin* v. *Crate,* 60 id. 215; *McCagg* v. *Heacock,* 34 id. 476; *Hardin* v. *Gouveneur,* 69 id. 140; *Davis* v. *Hall,* 92 id. 90.

Mr. JOHN C. PEPPER, for the appellees:

When a tenant in common conveys and warrants, the entire estate is a disseizin of his co-tenants, from which time the Statute of Limitations runs. Freeman on Co-tenancy and Partition, secs. 221, 224; Wood on Limitations, sec. 266; *Morey* v. *Morey,* 6 Metc. 360; *Going* v. *Urig,* 18 Ill. 242; *Hinchley* v. *Green,* 52 id. 242; *Busch* v. *Huston,* 75 id. 343; *Lavalle* v. *Strobell,* 89 id. 384; *Dugan* v. *Follett,* 100 id. 588.

Notice of other's rights, even the recording, can cut no figure on questions arising under the Statute of Limitations. *Woodward* v. *Blanchard,* 16 Ill. 433; *Dickerson* v. *Breeden,* 30 id. 280; *Jandon* v. *McDowell,* 56 id. 53.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The deed from Jane Patterson to Benjamin C. Taliaferro, being a warranty deed, purporting to convey the lot in controversy in fee simple, is at least color of title. (*Dickenson* v. *Breeden,* 30 Ill. 326.) The payment of taxes by Taliaferro from A. D. 1874 to 1884, inclusive, being admitted, it only remains to ascertain whether he acquired the deed from Jane Patterson in good faith, and if so, whether he was in possession under that deed.

The execution of the deed, and subsequent possession of the property, and payment of taxes thereon, by the grantee, create the presumption that the grantee obtained the deed in good faith, and that he is in possession under the deed, and it devolves on those claiming adversely, to prove either that the deed was not obtained by the grantee in good faith, or that the possession was not under the deed. *Dickenson* v.

*Breeden, supra; McConnel* v. *Street et al.* 17 Ill. 253; *Hardin* v. *Governeur,* 69 id. 140; *Davis* v. *Hall,* 92 id. 85.

A point is made on behalf of Amanda Armindale and Alvin Patterson, which, in the order of precedence, is entitled to be first noticed,—that the first section of the Limitation act of 1839 can have no application here, because, at the time Jane Patterson conveyed to Benjamin C. Taliaferro, she had only a life estate, and, she being still alive, the statute has not commenced to run against those having the estate in remainder, since they have never had the right to enter into the possession. Without saying whether this position is tenable as against one obtaining a warranty deed in fee simple, in good faith, without notice, it is enough to say that, in our opinion, it is not sustained by the facts proved, as disclosed by this record. The contention is predicated upon the sheriff's deed to B. D. Ellett, and the deed of B. D. Ellett to James Patterson, and the will of the latter, purporting to give a life estate in the property to Jane Patterson. It will be seen, by referring to the statement preceding this opinion, that in 1848 Matthew Patterson, the brother of James and the son of Jane, became the owner of this lot in fee simple. In 1849 he commenced building a brick house upon it, but in the fall of that year, and before the house was finished, he rented the lot and premises to B. D. Ellett for the term of two years, or until Matthew should return from California, whither he was making arrangements to soon depart. In consideration of this renting, Ellett paid Matthew $100 in cash, and agreed to finish the building, take care of the property, pay the taxes upon it, and settle the balance when Matthew returned, and, thereupon, he was let into possession. The taxes for which the sale was made by the sheriff, were, then, taxes which it was the duty of Ellett to pay. He could not acquire a title adverse to Matthew, or to Matthew's heirs-at-law, growing out of his own neglect to perform his contract. At most, he could but become seized, by virtue of the sheriff's deed, in

trust for Matthew, if living, and for his heirs-at-law, if dead. *O'Halloran* v. *Fitzgerald*, 71 Ill. 53.

It will also be perceived, from the statement preceding this opinion, that after thus leasing the property, Matthew conveyed it, on the 25th day of February, A. D. 1850, to Stephen S. Phelps, to secure a loan of money. The proof is clear that when Matthew, his father, and his brother next in years to himself, (John,) left for California, in the spring of 1850, they left the family, which then included Jane, (the mother,) James, (the oldest of the children remaining at home,) and William, Robert and Charles, his younger brothers, and Eliza, Jane and Maria, his sisters, all living together, as a family, in a little log house, and they continued to thus live together, as a family, for some years. James, although a minor, became the head of the family. He worked, first, at farming, and the other children worked about, but remained at home. Afterwards, he worked at brick making, and one or more of the younger boys worked with him, and the mother (Jane) boarded the hands. The father died in California. Then, in 1850 or 1851,—the evidence is not specific which,—Matthew died, and soon afterwards John died. Whether any money was derived from the estates of either of these, is not certain,— the inference, however, is in the negative. It is shown, by a remark attributed to the mother (Jane), that before Stephen S. Phelps conveyed to the heirs-at-law of Matthew, which was on the 4th of August, A. D. 1852, she claimed that it was his duty to convey; but whether he had been paid the loan by Matthew before his death, or was paid by her or some other member of the family, afterwards, does not appear. Ellett left the property, as his widow testifies, on the 25th of December, A. D. 1853, and several witnesses testify that when he moved out of the house, James and his mother, and his younger brothers and his sisters, moved into it. There are two or three witnesses who testify to having rented portions of the house, in 1854, from James, and being in possession, afterwards, for

some time, and that during the time of their occupancy the mother and family were not in the actual occupancy of any part of the property. It is difficult to reconcile the testimony of these witnesses with that of those who testify that James and his mother, and his younger brothers and his sisters, occupied the house immediately after Ellett moved out, and thence, continuously, until after the marriage of James, in 1856. But in any view, the evidence all agrees that James and his mother, and his younger brothers and his sisters, did reside together, as a family, until after his marriage, and, a portion of the time, in this house. Although we can not ascertain with precision what was the age of James at the date of the conveyance by Ellett to him, the inference from circumstances proved is, that it could not have exceeded twenty-one years, if, indeed, it was that. In effect, then, up to that time the evidence authorizes the conclusion that he had lived with his mother's family, working for it, and managing for it as the head of the family, and, as against his mother, was not entitled to retain any compensation he may have received for his services ; and the evidence therefore repels any inference that he could have had, at that time, any property separate and apart from that belonging to the family in common. The evidence establishes that the family had trouble with Ellett in regard to the property, before he moved out of the house. Thus, the widow of Ellett testifies: "There was some controversy with my husband about the rent of the property, but I don't know what it was." Thomas Rippey, a nephew of the mother, and a cousin of James, testified: "I heard of .some trouble between Patterson and Ben Ellett. My father came from New Jersey to Mercer county, to settle with Ellett for Mrs. Patterson. * * * She wanted Ellett out of the house."

From all the circumstances, it is evident that James must have known of the conveyance by Phelps to the heirs-at-law of. Matthew, and of the contract between Matthew and Ellett.

33—118 ILL.

The circumstance that Ellett surrendered possession of the property some months before he conveyed it to James, tends strongly to prove a recognition upon his part that he then claimed no right to hold the possession under his deed, and it is unreasonable to suppose that James,—a member of his mother's family, and the acting head of it,—was not entirely familiar with the whole transaction, and the motives controlling. The lapse of time, and the death of Ellett and James, render more specific proof unattainable. Our conclusion is, that James knew that Ellett acquired his deed in violation of his duty, under his contract with Matthew, and so that he held in trust for the heirs-at-law of Matthew, and thus knowing, the deed of Ellett only made him trustee instead of Ellett. But if we are mistaken in supposing that James knew that Ellett had thus obtained his deed, still the title, before that deed was executed, was in the heirs-at-law of Matthew, of which the prior record of the Phelps deed gave him notice. They claimed the right to the possession of the property, and, under that claim, Ellett surrendered the possession to them. The possession of James was not actually exclusive of that of his mother and his younger brothers and sisters, but in common with them; and the reasonable conclusion, from the evidence, is, that any money that James paid Ellett, was money which, legally, was the common property of the family, whether earned by him,— he being a minor,—or derived in some other way; and yet, if it be conceded that it was the money of James, in fact and in law, inasmuch as the evidence shows no prior disseizin of his mother and his younger brothers and his sisters, but a tenancy in common with them, the law requires that the title acquired from Ellett shall be held for the .equal benefit of all the heirs-at-law of Matthew, the others being required only to make contribution for the amount thus expended for the benefit of a common estate. *Busch* v. *Huston*, 75 Ill. 343 ;.

*Ball et al.* v. *Palmer et al.* 81 id. 375; *Park Commissioners* v. *Coleman,* 108 id. 591.

There is evidence that Jane (the mother) frequently said that she claimed under the will, and only a life estate. These remarks, it is evident, could not affect her co-heirs, and it being apparent that they were based on a mistake, and it not being pretended that any one acted upon them to his injury, so as to create an equitable estoppel, they could not conclude her. Whether, if they had been communicated to Taliaferro before he purchased, they would conclude him on the question of good faith, we are relieved from inquiry, since no one testifies that Taliaferro was informed, before his purchase, that she claimed only a life estate, and he himself testifies, positively, that he never heard of such a claim before he purchased, and that at that time he did not even know that James had made a will.

It is contended, on behalf of Burgett, that after the death of James, the mother (Jane) remained in possession as co-tenant with her children, from whom Burgett purchased; that while thus in possession, she, as co-tenant, rented two of the rooms in the house to Taliaferro; that Taliaferro afterwards went into possession, under the contract made with her, on the 16th of June, A. D. 1874, in which she only proposed to sell and deliver possession to him of what she claimed as the heir-at-law of Matthew Patterson, and the interests of four of her children as heirs-at-law of Matthew, and that Taliaferro's possession being thus in its inception not adverse, but in subordination to, the title of the parties from whom Burgett purchased, any purchase of title that he made afterwards is presumed to have been not adverse to the interests of his co-tenants, but in subordination to their rights, and to inure to the benefit of all the tenants in common. The evidence fails to show that when Mrs. Patterson rented the two rooms to Taliaferro, she rented only the interest of a tenant in common. On the contrary, she is shown at that time to have

had the exclusive possession of the property, making it her home, and exercising sole dominion over it. So far as the evidence shows what she claimed by her possession at that time, it shows that she claimed to be a life tenant. But whatever, as between her and her co-heirs, may have been her legal rights, as between Taliaferro and her she was, in that renting, landlord of the entirety. He was bound to attorn to her only. There is no evidence anywhere in the record that shows that Taliaferro, by the act of renting, recognized any other parties as landlords, or assumed any legal liability on that account to any one but her. The contract of the 16th of June, it is true, recites that Mrs. Patterson does thereby put Taliaferro in possession of the lot; but that was a matter *in pais*, the actual performance of which was to be in the future, and it is therefore liable to be explained or contradicted by parol. The parol evidence overcomes the recital, and clearly shows that Taliaferro was not put in possession of the lot under that contract. Thus, Thomas Rippey testified : "Mrs. Patterson was living in the house in June and August, A. D. 1874, when she sold to Taliaferro." B. C. Taliaferro testified : "I have been in possession of the property in controversy, and occupied it by actual residence, by tenants, since August, A. D. 1874, until this time. * * * I went into possession under my deed from Jane Patterson. * * * The warranty deed from Jane Patterson was not taken under the contract offered in evidence. I was to pay her $100, under the contract. She told me then that two of her children had made her deeds. Afterwards she told me she had got deeds from all of her children, to enable her to raise money to go to California. I told her if she would give me a warranty deed, I would pay her $300, and she made the deed in pursuance of this contract."

But apart from the evidence, we think the appellants are estopped by the pleadings from questioning that Taliaferro's entry into possession was under the deed made to him by

Mrs. Patterson. It is alleged in the original bill, "that said Taliaferro has been in possession of said premises," not under his renting or under the contract of sale, but, *"under said deed,* since 1874," and there is a like allegation in the cross-bill, and this allegation is admitted in the answer. The contract of June 16, 1874, it is true, is an admission that Mrs. Patterson then had only the interests therein described, but it admits nothing as to her title when she afterwards, on the 25th day of August, A. D. 1874, conveyed the whole by a warranty deed. Taliaferro, as has been seen, testifies that she then claimed that her children wanted her to sell the property and move to California,—that she had obtained deeds of the interests in the property of all of her children; and it is clear, if she had obtained such deeds, then she had ceased to be a tenant in common, was entitled to the sole possession, and might sell and convey this property just as if she had always been sole owner. The question is not, what title did she actually have,—but, what title did she assume to have and to convey. Color of title does not mean actual title, nor does the question of notice of outstanding titles affect it. *Dickenson* v. *Breeden, supra; Woodward* v. *Blanchard,* 16 Ill. 433; *McCagg* v. *Heacock,* 34 id. 476; *Cook* v. *Norton,* 43 id. 391; *Rawson* v. *Fox,* 65 id. 200; *County of Piatt* v. *Goodell,* 97 id. 84; *Conner et al.* v. *Goodman,* 104 id. 365; *Smith* v. *Ferguson,* 91 id. 304.

Taliaferro swears, that when Jane Patterson told him she had obtained deeds of the interests of all her children, he believed her, and that he then paid her $300 for a warranty deed for the lot, in good faith; and these cases hold, that the fact that he was negligent in not examining the records, and requiring the production of the deeds, is not sufficient to overcome that testimony. As was said in *McCagg* v. *Heacock:* "The knowledge of an adverse claim upon property does not, of itself, indicate bad faith in a purchaser, and is not even evidence of it, unless accompanied by some improper means

to defeat such claim." (See, also, *Whitney* v. *Stevens*, 77 Ill. 586, and *Coleman* v. *Billings*, 89 id. 183.) In the last named case we quoted, with approval, from *McCagg et al.* v. *Heacock*, 42 Ill. 157, this language: "The doctrine is, that bad faith, as contradistinguished from good faith, in the Limitation act, is not established by showing actual notice of existing claims or liens of other persons to the property, or by showing a knowledge, on the part of the holder of the color of title, of legal defects which prevent the color of title from being an absolute one. Where there is no actual fraud, and no proof showing that the color of title was acquired in bad faith, which means in or by fraud, this court will hold it was acquired in good faith."

The only circumstance here relied on as showing bad faith in the purchase, aside from the question of notice of record, and that Taliaferro ought to have known, and would, if he had been diligent, that Alvin Patterson was a minor, and therefore could not convey his interest in the lot, by a good deed, to his grandmother, is the evidence of one witness that the lot was worth more, by several hundred dollars, than Taliaferro paid for it. There was no proof that Jane Patterson was in any way misinformed or deceived by Taliaferro, or that the value of the lot was not as easily to be ascertained by her as by him, or, indeed, that she has ever been, or is now, dissatisfied with the price she received for the lot. This is, very clearly, insufficient to prove such fraud as is within the contemplation of the cases referred to.

But it is further contended, that inasmuch as Jane Patterson was only, in fact, a co-tenant of the property with the other heirs-at-law of Matthew Patterson, her deed only conveyed her interest to Taliaferro, and he thereby became only a tenant in common, as she had been, and that it is not any further even color of title. Had her deed only purported to convey her interest in the property, this would be true; but her deed, as has been seen, assumes to convey the entire title

to the lot, and to warrant and defend it. This operated as a disseizin of her co-tenants, and the statute commenced running against them from the moment it was put upon record, followed, as it was, by the exclusive possession and payment of taxes by Taliaferro. It is said by a modern author of high standing: "If the conveyance made by a tenant in common, in addition to purporting to dispose of the entirety, contains a covenant of general warranty against the claims of all persons, no room is left for a doubt that the grantor intended to deal with the lands as his individual estate, and that the grantee believed that he was acquiring an estate in severalty. The entry of the grantee can not be presumed to be that of a co-tenant, or in subordination of the rights of co-tenancy. Acts of ownership on the part of such a grantee must necessarily be adverse to any other part owner. His possession, taken under such deed, and continuing the requisite period of time, creates in him a complete title in severalty, by virtue of the Statute of Limitations. When one tenant in common conveys the whole estate in fee, with covenants of seizin and warranty, and his grantee enters, and claims and holds exclusive possession, the entry must be deemed adverse to the title and possession of the co-tenant, and amount to a disseizin." Freeman on Co-tenancy, sec. 224. See, also, authorities cited by him, and *Parker* v. *Proprietors of Lock, etc.,* 3 Metc. 91, (37th Am. Dec. 121, and notes on p. 126,) and, also, *Goewey* v. *Urig,* 18 Ill. 234, and *Hinkley et al.* v. *Green,* 52 id. 223.

The judgment must be affirmed.

*Judgment affirmed.*